IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 20, 2011 Session

# IN RE: TAYLOR BW, and ASHLEY NW.

**Appeal from the Chancery Court for McMinn County**
**No. 2009-CV-7240     Hon. Jerri S. Bryant, Chancellor**

**No. E2011-00352-COA-R3-PT-FILED-OCTOBER 28, 2011**

The father and his wife petitioned the Court to terminate the parental rights of the two minor children's mother and allow the father's wife to adopt the two minor children. After a myriad of pleadings, the Trial Court held an evidentiary hearing and ruled that the father had proved statutory grounds to terminate the mother's parental rights, and that it was in the best interest of the two minor children that her parental rights be terminated. The mother petitioned to reconsider, and upon further consideration the Trial Court reversed its ruling and held that it was not in the children's best interest to terminate her rights as a parent of the two children. Petitioners appealed, and on appeal we hold that clear and convincing evidence established the statutory grounds for termination and clear and convincing evidence established that it was in the children's best interest to terminate the mother's parental rights. Further, that the Trial Judge in reversing her findings that it was in the best interest of the children to terminate the parental rights of the mother, focused on the rights of the mother rather than the rights of the children, as required by the statute and authorities. We reinstate the original Judgment of the Trial Court terminating the mother's parental rights.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Reversed.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, J., and JOHN W. MCCLARTY, J, joined.

Shelley S. Breeding, Allison J. Starnes-Anglea, and David L. Dothard, Knoxville, Tennessee, for the appellants, RAW and LEW.

John F. Kimball, Cleveland, Tennessee, Guardian Ad Litem.

Phillip M. Jacobs, Cleveland, Tennessee, for the appellee, KRH.

## OPINION

Petitioners, RW and wife, LW, filed a Petition for Termination of Parental Rights against respondent, KH, regarding two minor children, Taylor and Ashley W. Petitioners alleged that RAW ("father") was the biological father of the children, and that KRH ("mother") was the biological mother of the children.

Petitioners alleged that the mother was incarcerated, and that for four months before her incarceration she failed to visit/exercised only token visitation with the children, and that she also failed to provide financial support. Petitioners alleged that the mother's lengthy incarceration also provided grounds for termination, as well as the fact that her criminal record exhibited wanton disregard for the children's welfare.

Petitioners also filed a Petition for Adoption by a Step-Parent, stating that the father's wife, LW wished to adopt the children, and that the children had lived with the father and LW since 2008.

The maternal grandmother, filed a Motion to Consolidate, asking the Court to consolidate this action with a circuit court action wherein she was given visitation rights with the children.

A guardian ad litem was appointed to represent the children's interests, and the father filed several supplemental petitions, seeking dismissal of the grandmother's action and opposing consolidation. The Court entered an Order denying visitation to the grandmother, based on Tenn. Code Ann. §36-6-116(f)(2), because adoption proceedings were pending. The father also filed an objection to the mother's visitation for the same reason.

The Court held a hearing on April 21, 2010, and entered an Order which found the following:

1. The mother and father were divorced on March 20, 2002.

2. The mother was convicted of attempted second degree murder on May 5, 2003.

3. A petition for grandparents' rights was filed in April 2003.

4. In October 2003, the Court found that the maternal grandmother had a significant relationship with the children and gave her visitation rights.

5. All parties, including the mother, and the guardian ad litem, agreed to a

mediated Amended Permanent Parenting Plan in 2004, which provided that while the mother was in jail, the grandmother would have one weekend a month with the children, to allow the children to go see the mother. The grandmother was also allowed phone contact, lunch visits, etc. It was agreed that after the mother was released, the parties would go back to their original PPP, with the grandmother supervising the mother's visits.

6. In October 2009, the father filed to terminate the mother's parental rights.

The Court noted that Tenn. Code Ann. §36-6-116(f)(2) provided that any proceedings regarding visitation be stayed until the adoption issue is heard. The Court thus declined to rule on those issues until the adoption was addressed. The Court then entered an Amended Order, deleting the reference in the earlier order that the Judge in the visitation matter found the grandmother had a significant relationship with the children. The Court stayed all issues until the trial scheduled in November 2010, and found that it could not enforce the mediated agreement by allowing the grandmother to take the children to the prison to visit the mother. The mother filed Answers to both the Petition for Termination of Parental Rights, and the Petition for Adoption by Step-Parent, and denied that relief should be granted to the W's. The mother argued that *res judicata* should bar the father from now claiming the mother's incarceration was a ground for termination of her parental rights, when he knew of same at the time of the earlier agreed order.

Following the evidentiary hearing, the Trial Court entered an Order, and found that the father had to prove grounds for termination of the mother's parental rights by clear and convincing evidence. The Court found the mother pled guilty to the attempted murder of the father and was sentenced to twelve years of incarceration when the minor children were five and seven. The Court found the father had proven this ground by clear and convincing evidence, but had not proven any of the other grounds alleged. The Court found that respondents had the burden to prove the defense of *res judicata*. It said that it would not apply in this case, however, because the step-mother was not a party to the prior action. The Court stated that it had analyzed the best interest factors, and found the mother's actions against the father did not take into consideration the children's psychological stability. The Court found that the youngest child did not have a meaningful relationship with the mother, and that petitioners proved termination of the mother's parental rights was in the best interest of the children by clear and convincing evidence.

The Court attached its Memorandum Opinion, wherein the Judge made more detailed findings regarding best interests. The Court stated that, when she saw the children testify, she saw that they were tortured inside, and not by the lawyers. The Court stated that the children had voiced a fear to be around a mother that might hurt them. The Court stated that she had been given two different explanations regarding what happened between the mother

and father, so that might explain why the children were afraid, because the mother had failed to explain what happened sufficiently to them. The Court found the children had that fear because the father had that fear based on what happened to him. The Court concluded that the case was difficult to decide, and that it would have been beneficial to have the testimony of a professional. The Court stated, however, that given the fact that the mother didn't consider the children in her actions, and given the fact that the youngest didn't have a relationship with her and that the children had voiced their desire that the mother's rights be terminated, the Court found that termination was in the best interest of the children.

The mother then filed a Motion to Alter or Amend, and argued the Court's order should be altered because the Court was conflicted about the weight of the evidence, and the father should be barred by collateral estoppel from raising issues regarding the mother's criminal history because he know about it when he signed the order agreeing to give her visitation after she got out of prison.

The Trial Court then entered an order on January 25, 2011, stating that after further consideration, the Court found the mother did have a meaningful relationship with the children prior to the stepmother's involvement, and there was no expert proof of any harm that would befall the children if they spent time with the mother. The Court then said it employed the best interest analysis under Tenn. Code Ann. §36-1-113 (i)(6), regarding whether the mother had shown brutality to an adult in the family. The Court found the mother was convicted of attempted second degree murder of the father, but that the father sought to keep the mother involved in the children's lives after her conviction, and that the mother did everything she could while incarcerated to maintain a relationship with the children. The Court then reiterated that the burden was on the RAW and LEW to show that termination was in the best interests of the children by clear and convincing evidence, and that they had failed to carry their burden and thus denied the petition to terminate the mother's parental rights.

On appeal, RAW and LEW raise these issues:

1.      Whether the Trial Court's initial finding that termination of the mother's parental rights was in the children's best interests should be affirmed, reversing the ruling on the motion to alter/amend?

2.      Whether the failure of the Trial Court to have an opportunity to review or perceive a recommendation on the best interests of the children constituted reversible error?

It is not disputed that the Trial Court properly found that grounds existed for

termination of the mother's parental rights pursuant to Tenn. Code Ann. §36-1-113(g)(6), i.e., that she had been sentenced to a correctional facility for ten or more years, and that the children were under the age of 8 at the time the sentence was entered.

The statute provides that, "In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101."

Tenn. Code Ann. §36-1-113(i). Whether termination is in the best interest of the child must be proven by clear and convincing evidence. *In re Valentine*, 79 S.W.3d 539 (Tenn. 2002).

The Trial Court initially found that clear and convincing evidence existed to show that termination of the mother's parental rights was in the girls' best interests, but later reversed the ruling in its Order on the mother's motion to alter or amend.

Examining each of the statutory factors in turn, it would appear that the mother had made some adjustment of her circumstances, conduct or conditions as to make it safe for the girls to be in her home, as she had gotten out of prison, had taken some drug rehabilitation classes while in prison, and had taken vocational classes to increase her employability. At the time of trial, the mother had been out of prison for about a month, and it is speculative as to whether these changes would be lasting ones. It was noted the mother was living with her parents and dependent upon them for her home and her job, and the biggest fear expressed by the girls is their fear of being alone with the mother. The girls are aware the mother was incarcerated for trying to kill their father, whom they clearly love very much, as he has been the only constant in their lives. The girls both stated that they had tried to ask the mother about the incident, but she refused to answer their questions, and they were fearful that what happened to their father could happen again. The Trial Court appeared to discount this fear, saying the girls and the father used the same words and their testimony seemed rehearsed. A review of the evidence demonstrates that the only words used were they were "scared".

Reviewing the factors, it is clear the Trial Court's first ruling that termination was in the best interest of the children was supported by clear and convincing evidence. The mother tried to kill the father by injecting him with a chemical used to euthanize animals, and the children expressed a fear of the mother because of this and did not wish to visit her. The children stated they had no meaningful relationship with her and wished to be adopted by their stepmother, whom they loved.

As this Court has previously explained, the best interests analysis focuses on the child, and not on the parent.

> The question of the parent's rights is relevant during this phase of the court's inquiry only to the extent that it impacts the child's best interest. When the interests of the child and the parents diverge, the best interests of the child must prevail.

> The best interests of the child do not become the paramount consideration until the trial court has determined that the parent is unfit based on clear and convincing evidence of one or more of the grounds for termination listed in Tenn.Code Ann. § 36-1-113(g). Once a parent has been found to be unfit, the interests of the parent and

child diverge. While the parent's interests do not evaporate upon a finding of unfitness, the focus of the proceedings shifts to the best interests of the child.

The legislature has clearly stated the rule in this regard:

> In all cases, when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child, which interests are hereby recognized as constitutionally protected and, to that end, this part shall be liberally construed.

Tenn.Code Ann. § 36-1-101(d).

*In re MH*, 2005 WL 3273073 (Tenn. Ct. App. Dec. 2, 2005)(citations omitted).

In the *MH* case, the father was incarcerated, and the court noted that "many of the factors, such as the failure to pay child support, lack of regular visitation, and failure to make an adjustment of circumstances, are inherent to the constraints imposed by incarceration. While that does not mean that they are irrelevant to the question of best interests, the establishment of the ground of incarceration for ten years necessarily implies the parent will be unable to provide parental support and care that would otherwise be available. But the best interest analysis is a separate requirement from the establishment of grounds, and the factual situations involving incarcerated parents will vary from case to case. . . . As with any other termination of parental rights case, individualized decision making based on the facts of the particular case is required." *Id.*, at f.n. 11. This Court went on to discuss:

> The trial court's written final judgment only mentions three factors affecting the best interest of M.H.: that a meaningful relationship had not been established between father and child, that the child had established a close bond with the Bs, and that to subject the child to a relationship with the father was likely to have a detrimental effect on his emotional and psychological condition, which we interpret as relating to the close bond between M.H. and his siblings and the sense of security provided by that bond The father does not dispute the finding of a close emotional bond with the Bs.
>
> The father argues that there was insufficient evidence presented for the trial court to conclude that subjecting M.H. to a relationship with his father would be emotionally and psychologically detrimental to the child. We think the relevant evidence, however, is that regarding the relationship between M.H. and his siblings as well as their integration into the Bs' home. Prior to the Bs obtaining custody, M.H. and his siblings were subjected to constant uncertainty and instability, frequent changes of residence, intermittent disappearances by the mother, and exposure to drug use.

Through all this uncertainty, the three children were never separated from each other. As a result, they bonded strongly to one another, finding each other's presence to be the one comforting constant in an otherwise unstable world. After the Bs took on the role of parents, the children were able, for the first time, to experience the security and peace of mind that comes from being part of a stable and loving family. The trial court was properly concerned about this relationship.

The father concedes that he did not have a meaningful relationship with his son at the time of trial, but he claims that he did have such a relationship in the past, which the Bs undermined by failing to promote contact between himself and M.H. The father has overstated the significance of his prior relationship to M.H. He has been incarcerated in a distant location for the entire lifetime of the child. His own testimony showed that before he was sent to the federal prison in California, R.A. only saw his son twice, both times before the child reached the age of two and both times under the restrictions applicable to jail visitation.

The father argues that the phone calls he made and the presents he had others send on his behalf prior to the Bs obtaining custody of M.H. constituted evidence of a meaningful relationship. We find that a doubtful proposition at best. A meaningful relationship must be meaningful to both parties, especially where the child's interest is paramount. The father's rare and brief contacts with his son may have had some meaning to him, but from the point of view of a child so young, such tenuous contact is unlikely to carry very much meaning. The evidence in this case is that M.H. considered Mr. B his father and never mentioned R.A. There is simply no evidence that the child missed the calls from R.A. or had any significant connection to him.

The father contends that the acts of "the Ministry," Ms. Mustin, or of the Bs deprived him of meaningful contact with his son, because he did not know where either the child or the mother was. However, it was actually the mother's abandonment of the children and her incarceration that led to the children's placement in the custody of first Ms. Mustin and then the Bs. R.A. had apparently taken no action to have his relatives, DCS, or anyone else investigate to insure his child was being cared for by the drug-addicted mother. Additionally, if we totally disregard the time during which R.A. claims he was unable to contact M.H., the evidence shows that M.H. did not have a meaningful relationship with R.A. prior to that time.

*Id.* Thus, this Court found that the best interests of the child mandated termination of the father's parental rights. *Id.*

Similarly, in another case wherein the best interests analysis was discussed, this Court stated:

Mr. Marr also takes issue with the trial court's conclusion that terminating his parental rights is in the best interests of the child. He asserts that many of the factors in Tenn.Code Ann. § 36–1–113(i) for determining a child's best interests do not apply to him because he is incarcerated and that the court placed undue weight on his failure to support the child financially. He also asserts that terminating a biological parent's parental rights is never in a child's best interests unless the continuation of the parent-child relationship would harm the child.

\* \* \*

The child's best interests must be viewed from the child's, rather than the parent's, perspective. A focus on the perspective of the child is the common theme running through the list of mandatory factors specified in Tenn.Code Ann. § 36–1–113(i). By the time the court reaches the best interests analysis, it will have already made a finding, supported by clear and convincing evidence, that the parent is unfit or poses a risk of substantial harm to the welfare of the child. Accordingly, the exclusive focus on the perspective of the child in the best interests analysis does not contravene the parent's constitutional rights.

Ascertaining a child's best interests does not call for a rote examination of each of Tenn.Code Ann. § 36–1–113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Marr*, 194 S.W.3d 490 (Tenn. Ct. App. 2005)(citations omitted).

In this case, the Trial Court seemingly placed a great deal of emphasis on the fact the father expressed fear of the mother, which the Trial Court concluded affected how the children felt about the mother. From reviewing the Trial Court's findings, however, it appears that in conducting the best interest analysis, the Trial Court viewed the evidence more from the standpoint of the mother's rights rather than from what was in the best interests of the children. The Court stated that she was not "discounting" the children's fear of the mother, but then stated there was no proof the mother would harm the children, and even hypothesized that perhaps the crime which the mother confessed to committing, i.e. attempting to kill the father via a lethal injection, was really only a "failed drug high". The Trial Court discounted the mother's own discrepancies in her testimony, wherein she stated that she gave the father a flu shot and nothing but a flu shot, that she took the exact same injection herself, then tried to say she was trying to get high when she injected herself. When

questioned again, the mother still maintained that she thought she was giving the father a flu shot. When asked why she pled guilty to second degree attempted murder if she was only giving father a flu shot, she said that was what her attorney advised her to do. The mother's trial testimony was replete with contradictions, yet nonetheless seemed to give the Trial Court pause.

Considering the best interests of the girls and not the mother, however, was the Trial Court's responsibility. This Court has always recognized that a parent who physically abuses the other parent in some way should have this factor militate in favor of termination, rather than just explaining it away as the Trial Court attempted to do in this case. *See, e.g., In re JCJ and JEJ*, 2007 WL 1215020 (Tenn. Ct. App. Apr. 25, 2007). The Trial Court made several findings regarding the fact the mother had made efforts to rehabilitate herself in prison and seemed to want to give her a "second chance". However, as this Court has previously stated, "The question before us is not whether Mother should be given another chance to establish and maintain a relationship with her sons. Instead, it is what effect termination of Mother's parental rights would have on the [children]." *In re JAK and KRK*, 2006 WL 211807 (Tenn. Ct. App. Jan. 26, 2006). The Court went on to explain, "It is not difficult to perceive that re-introduction of Mother into the boys' otherwise settled lives would cause some disruption. Whether or not she could establish a relationship with them that would add to their lives is questionable in view of their ages and the time that has passed. If she were not successful or, more significantly, were she to fail to follow through with visits after initially visiting regularly, the consequences to the boys would be harmful, perhaps devastating." *Id.* In this case the girls were age twelve and fourteen at the time of trial, and had not seen their mother for about two years. They arguably never had a meaningful relationship with the mother, as she has been in prison since they were approximately four and six years old. The Trial Court expressed concern for the mother's rights and how this would impact on her, and clearly focused on the mother's rights more than the children's rights, which was error at this point in the analysis.

Given the evidence presented, and viewing the same from the perspective of what is best for the children as is required in all termination cases, the Trial Court's initial ruling that there was clear and convincing evidence to show that termination of the mother's parental rights was in the best interests of the children is reinstated, and the Court's ruling on the motion to alter or amend is reversed.

Finally, the father argues that it was error for the Trial Court to fail to ask for the recommendation of the guardian ad litem. The guardian ad litem filed a brief in this matter, and stated that he participated in the trial, and did not call witnesses or elicit testimony because he felt that the other attorneys had fairly presented the issues and evidence to the Court. The guardian stated that the children's testimony was consistent with what they had told him previously, and that he expressed to the Court his concerns about the credibility of

the mother's testimony, even though his comments were not ultimately transcribed.  The guardian states in his brief that he believes that termination is in the children's best interests and that the Trial Court's original ruling on this matter should be reinstated.  This issue does not need to be further addressed.

The Trial Court's Judgment on the Motion to Alter or Amend is reversed, and the Trial Court's original finding that termination of the mother's parental rights is in the best interest of the children is ordered reinstated.

The cost of the appeal is assessed to KH.

_____
HERSCHEL PICKENS FRANKS, P.J.