**In re Shon Austin MARR.**

Court of Appeals of Tennessee,
at Nashville.

Oct. 12, 2005 Session.

Nov. 16, 2005.

Permission to Appeal Denied by
Supreme Court May 8, 2006.

Judy A. Oxford, Franklin, Tennessee, for the appellant, Justin Marr.

Donna L. Green, Brentwood, Tennessee, for the appellees, Stuart Howlett and Christy Howlett.

Robert H. Plummer, Jr., Franklin, Tennessee, Guardian ad Litem for Shon Austin Marr.

## OPINION

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., joined. WILLIAM B. CAIN, J., filed a separate concurring opinion.

This appeal involves the second petition to terminate the parental rights of a biological father who is serving a sixteen-year prison sentence for a particularly violent robbery. When the child's mother first petitioned to terminate the father's parental rights, the Tennessee Supreme Court held that she lacked standing to file a termination petition. *Osborn v. Marr*, 127 S.W.3d 737, 738 (Tenn.2004). Thereafter, the mother and her husband filed a second petition in the Williamson County Juvenile Court seeking to terminate the father's parental rights. The juvenile court terminated the father's parental rights following a bench trial. On this appeal, the father asserts that the ground for termination relied upon by the trial court does not apply to him and that the evidence does not support the termination of his parental rights. We have determined that the father waived his challenge to the applicabil-

ity of the termination ground and that the record contains clear and convincing evidence supporting the juvenile court's decision to terminate the father's parental rights.

## I.

Justin Chandler Marr began dating Christy Renee Osborn in 1996. Mr. Marr was twenty-one years old, and Ms. Osborn was sixteen.[1] In October 1997, Mr. Marr committed a brutal carjacking in which he slashed a young woman repeatedly with a broken beer bottle, beat her unconscious, stole her vehicle, and left her for dead. Mr. Marr was released on bond pending trial, and during this time, he and Ms. Osborn conceived a child. The child, Shon Austin Marr, was born on September 10, 1998.[2] Less than four months later, on February 8, 1999, Mr. Marr pled guilty to one count of especially aggravated robbery.[3] He was sentenced to serve sixteen years in prison.[4]

Ms. Osborne took the child to visit Mr. Marr in prison during the first year of Mr. Marr's incarceration. However, she eventually decided that the prison environment was not appropriate for the child and dis-continued the visits. Mr. Marr's last visit with the child occurred on February 27, 2000. Over the next five years, Mr. Marr sent a few token birthday gifts and Christmas cards and telephoned once. He sent a total of $125 to support the child from his job at the prison where he earned $40 per month, and his family sent Ms. Osborn gifts totaling $100 at most. During the same period, Mr. Marr managed to send his mother approximately $300 to be kept in a separate account for his own use following his eventual release from prison.

On July 5, 2001, Ms. Osborn filed a petition in the Chancery Court for Williamson County seeking to terminate Mr. Marr's parental rights. The petition was based solely on the ground for termination in Tenn.Code Ann. § 36–1–113(g)(6) (2005)[5] and Ms. Osborn's claim that it would be in the child's best interests for Mr. Marr's parental rights to be terminated. The trial court found clear and convincing evidence of the statutory ground for termination but refused to terminate Mr. Marr's parental rights. The trial court reasoned that the evidence did not support a separate finding that continuation of the parent-child relationship would

1. This court customarily uses pseudonymous designations for the parties in termination cases. However, we are not using the designations for this appeal because earlier appeals used the parties' names.

2. As some points in the record, the child's date of birth is listed as October 10, 1998. At other points, it is listed as September 10, 1998. At trial, Ms. Osborn confirmed that the child was born in September rather than October of 1998.

3. On July 26, 2001, the Tennessee Court of Criminal Appeals upheld the Davidson County Criminal Court's denial of Mr. Marr's petition for post-conviction relief. *Marr v. State*, No. M2000–01412–CCA–R3–PC, 2001 WL 844401 (Tenn.Crim.App. July 26, 2001) (No Tenn. R.App. P. 11 application filed).

4. Tenn.Code Ann. § 40–35–501(i)(2) (2003) specifies eleven particularly heinous crimes for which parole is unavailable. Especially aggravated robbery is included on this list. Tenn.Code Ann. § 40–35–501(i)(2)(E). Thus, a person convicted of especially aggravated robbery "shall serve one hundred percent (100%) of the sentence imposed by the court less sentence credits earned and retained." Tenn.Code Ann. § 40–35–501(i)(1).

5. Tenn.Code Ann. § 36–1–113(g)(6) provides that parental rights may be terminated when "[t]he parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court."

cause substantial harm to the child and that in the absence of such a finding it would be unconstitutional to terminate Mr. Marr's parental rights.

Ms. Osborn appealed. This court held that a separate finding of substantial harm is not required once the trial court has found clear and convincing evidence of the existence of at least one of the statutory grounds for termination of parental rights and ordered the case remanded to the trial court to determine whether termination of Mr. Marr's parental rights was in the best interests of the child. *In re Marr*, No. M2001–02890–COA–R3–CV, 2003 WL 152640 (Tenn.Ct.App. Jan.23, 2003), *perm. app. granted* (Tenn. May 27, 2003).[6] However, the Tennessee Supreme Court granted the father's application for permission to appeal and held that the termination statutes then in force did not confer standing on a parent to file a petition to terminate the other parent's parental rights. *Osborn v. Marr*, 127 S.W.3d 737, 738, 741 (Tenn.2004).[7] The court held that the trial court lacked subject matter jurisdiction to adjudicate the merits of Ms. Osborn's petition, vacated the decisions of this court and the trial court, and dismissed the termination petition. *Osborn v. Marr*, 127 S.W.3d at 741.

While the appeal was pending, Ms. Osborn married Stuart Howlett. Ms. Osborn met Mr. Howlett in mid–1999. They had friends in common who babysat the child, and Mr. Howlett met the child around the same time that he met Ms. Osborn. Ms. Osborn and Mr. Howlett began dating in 2000, and the child would often accompany them on dates to the park or for a picnic. Ms. Osborn and Mr. Howlett were married on June 29, 2002. Mr. Howlett is the only father the child has ever known. Mr. Howlett taught him how to ride a bike, helps coach his sports teams, and attends his parent-teacher conferences. Even Mr. Marr concedes that Mr. Howlett has been a wonderful father to the child.

Mr. Marr waited almost one year after the Tennessee Supreme Court dismissed Ms. Osborn's termination petition before seeking further contact with the child. On November 10, 2004, while still incarcerated, Mr. Marr filed a "Petition for Standard Parenting Rights Order" in the Williamson County Juvenile Court. On February 2, 2005, Mr. Howlett and Ms. Howlett[8] filed

---

**6.** See *In re Audrey S.*, 182 S.W.3d 838, 881 (Tenn.Ct.App. Aug.25, 2005) *perm. app. dismissed* (Tenn. Nov. 4, 2005); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn.Ct.App.2004); *In re C.D.C., Jr.*, No. E2003–01832–COA–R3–PT, 2004 WL 1243994, at *8 (Tenn.Ct.App. June 7, 2004) (No Tenn. R.App. P. 11 application filed); *State Dep't of Children's Servs. v. Whaley*, No. E2001–00765–COA–R3–CV, 2002 WL 1116430, at *9 (Tenn.Ct.App. May 30, 2002) (No Tenn. R.App. P. 11 application filed); *State Dep't of Children's Servs. v.C.S.M.*, No. E2000–02806–COA–R3–JV, 2002 WL 385870, at *6 (Tenn.Ct.App. Mar.13, 2002), *perm. app. denied* (Tenn. Sept. 16, 2002); *Ray v. Ray*, 83 S.W.3d 726, 732 n. 7 (Tenn.Ct.App.2001).

**7.** In 1971, the General Assembly enacted a statute expressly allowing the mother of a child born out of wedlock to file a petition to adopt the child, thereby effectively terminating the biological father's parental rights. Act of May 17, 1971, ch. 329, § 1, 1971 Tenn. Pub. Acts 877, 877. This provision was repealed in 1995 as part of a comprehensive revision of the laws governing adoption and termination of parental rights. Act of May 26, 1995, ch. 532, § 1, 1995 Tenn. Pub. Acts 951, 952. It is unclear whether this procedure remains available in adoption proceedings, albeit on a gender-neutral basis. *See* Tenn.Code Ann. § 36–1–115(a) (2005) ("Any person over eighteen (18) years of age may petition the chancery or circuit court to adopt a person"). This question was not presented in *Osborn v. Marr*, and accordingly, the Tennessee Supreme Court did not address it.

**8.** Following her marriage to Mr. Howlett, Ms. Osborn changed her last name to "Howlett." She did not change the child's last name. Thus far, Ms. Howlett and Mr. Howlett have

a second petition to terminate Mr. Marr's parental rights. This petition, like the first, was based solely on the ground for termination in Tenn.Code Ann. § 36–1–113(g)(6) and the claim that terminating Mr. Marr's parental rights would be in the child's best interests. However, unlike the first petition, Mr. Howlett was a party to the second petition and asserted his desire to adopt the child if Mr. Marr's parental rights were terminated.[9] Following a bench trial at which Mr. Marr, Mr. Howlett, and Ms. Howlett testified, the trial court granted the second termination petition. Mr. Marr appealed.

## II.

### THE STANDARDS OF REVIEW IN TERMINATION OF PARENTAL RIGHTS CASES

■ A biological parent's right[10] to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions.[11] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 2059–60, 147 L.Ed.2d 49 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn.1993); *Ray v. Ray*, 83 S.W.3d at 731. While this right is fundamental and superior to the claims of other persons and the government, it is not absolute. *State v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn.Ct.App.2004). It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn.2002); *In re S.M.*, 149 S.W.3d 632, 638 (Tenn.Ct.App. 2004); *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn.Ct.App.2004).

■ Termination proceedings in Tennessee are governed by statute. Parties who have standing to seek the termination of a biological parent's parental rights must prove two things. First, they must prove the existence of at least one of the statutory grounds for termination.[12] Tenn.Code Ann. § 36–1–113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn.2003); *Jones v. Garrett*, 92 S.W.3d at 838. Second, they must prove that terminating the parent's parental rights is in the child's best interests.[13] Tenn.Code Ann. § 36–1–113(c)(2); *In re A.W.*, 114 S.W.3d 541, 545 (Tenn.Ct.App.2003); *In re C.W.W.*, 37

---

elected not to tell the child anything about Mr. Marr or that Mr. Howlett is not his biological father. The child is aware that his last name is different from that of Ms. Howlett and Mr. Howlett, but he has not yet raised the issue.

9. Step-parent adoption is expressly authorized by the Tennessee Code. Tenn.Code Ann. §§ 36–1–115(c), 36–1–117(a)(1) (2005). Moreover, Tenn.Code Ann. § 36–1–113(b) explicitly provides that "[t]he prospective adoptive parent or parents of the child ... shall have standing to file a petition ... to terminate parental ... rights." Thus, the jurisdictional defect in the first termination petition identified by the Tennessee Supreme Court in *Osborn v. Marr* is not present in this case.

10. This right exists notwithstanding the marital status of the child's biological parents where a biological parent has established or is attempting to establish a relationship with the child. *Lehr v. Robertson*, 463 U.S. 248, 262, 103 S.Ct. 2985, 2993–94, 77 L.Ed.2d 614 (1983); *In re D.A.H.*, 142 S.W.3d 267, 274 (Tenn.2004); *Jones v. Garrett*, 92 S.W.3d 835, 840 (Tenn.2002); *In re Swanson*, 2 S.W.3d 180, 188 n. 12 (Tenn.1999). The right also extends to adoptive parents. *Simmons v. Simmons*, 900 S.W.2d 682, 684 (Tenn.1995).

11. U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8.

12. The statutory grounds for terminating parental rights are found in Tenn.Code Ann. § 36–1–113(g).

13. The factors to be considered in a "best interests" analysis are found in Tenn.Code Ann. § 36–1–113(i).

S.W.3d 467, 475–76 (Tenn.Ct.App.2000); *In re M.W.A., Jr.,* 980 S.W.2d 620, 622 (Tenn.Ct.App.1998).

■ No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever. Tenn.Code Ann. § 36–1–113(i)(1); *M.L.B. v. S.L.J.,* 519 U.S. 102, 119, 117 S.Ct. 555, 565, 136 L.Ed.2d 473 (1996); *In re Knott,* 138 Tenn. 349, 355, 197 S.W. 1097, 1098 (1917); *In re D.D.K.,* No. M2003–01016–COA–R3–PT, 2003 WL 23093929, at *8 (Tenn.Ct.App. Dec.30, 2003) (No Tenn. R.App. P. 11 application filed). Because the stakes are so profoundly high, Tenn. Code Ann. § 36–1–113(c)(1) requires persons seeking to terminate a biological parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence. This heightened burden of proof minimizes the risk of erroneous decisions. *In re C.W.W.,* 37 S.W.3d at 474; *In re M.W.A., Jr.,* 980 S.W.2d at 622.

■ Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State Dep't of Children's Servs. v. Demarr,* No. M2002–02603–COA–R3–JV, 2003 WL 21946726, at *9 (Tenn.Ct. App. Aug.13, 2003) (No Tenn. R.App. P. 11 application filed), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence, *In re Valentine,* 79 S.W.3d 539, 546 (Tenn.2002); *In re S.M.,* 149 S.W.3d at 639; *In re J.J.C.,* 148 S.W.3d 919, 925 (Tenn.Ct.App.2004). It produces in a factfinder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.,* 84 S.W.3d 592, 596 (Tenn.Ct.App.2002); *Ray v. Ray,* 83 S.W.3d at 733; *In re C.W.W.,* 37 S.W.3d at 474.

■ Because of the gravity of their consequences, proceedings to terminate parental rights require individualized decision making. *In re Swanson,* 2 S.W.3d at 188. Accordingly, Tenn.Code Ann. § 36–1–113(k) explicitly requires courts terminating parental rights to "enter written orders containing specific findings of fact and conclusions of law" whether they have been requested to do so or not. *In re S.M.,* 149 S.W.3d at 639; *In re M.J.B.,* 140 S.W.3d at 653–54. These specific findings of fact and conclusions of law facilitate appellate review and promote just and speedy resolution of appeals. When a lower court has failed to comply with Tenn. Code Ann. § 36–1–113(k), the appellate courts must remand the case with directions to prepare the required findings of fact and conclusions of law. *In re D.L.B.,* 118 S.W.3d at 367; *In re K.N.R.,* No. M2003–01301–COA–R3–PT, 2003 WL 22999427, at *5 (Tenn.Ct.App. Dec.23, 2003) (No Tenn. R.App. P. 11 application filed).

■ The heightened burden of proof mandated by Tenn.Code Ann. § 36–1–113(c)(1) requires us to adapt Tenn. R.App. P. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R.App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights. *Jones v. Garrett,* 92 S.W.3d at 838; *In re Valentine,* 79 S.W.3d at 548–49; *In re S.M.,* 149 S.W.3d at 640; *In re M.J.B.,* 140 S.W.3d at 654.[14]

---

**14.** These decisions draw a distinction be-     tween specific facts and the combined weight

## III.

### The Ground for Terminating Mr. Marr's Parental Rights

■ Mr. Marr argues for the first time on appeal that the ground of termination in Tenn.Code Ann. § 36–1–113(g)(6) should not apply to him because the child was born after he committed the crime for which he is currently incarcerated. According to Mr. Marr, the other grounds for termination of parental rights listed in Tenn.Code Ann. § 36–1–113(g) all depend on circumstances or behavior that occur after a child is conceived or born, and a similar limitation should therefore be read into the ground for termination in Tenn. Code Ann. § 36–1–113(g)(6).

■ Mr. Marr waived this argument by failing to raise it in the trial court in the first instance,[15] *Taylor v. Beard*, 104 S.W.3d 507, 511 (Tenn.2003); *Lee v. State*

*Volunteer Mut. Ins. Co.*, No. E2002–03127–COA–R3–CV, 2005 WL 123492, at *9 n. 13 (Tenn.Ct.App. Jan.21, 2005) (No Tenn. R.App. P. 11 application filed), and he has alleged no other error in the trial court's application of this ground to terminate his parental rights. Accordingly, the trial court did not err in terminating Mr. Marr's parental rights on the basis of Tenn.Code Ann. § 36–1–113(g)(6).[16]

## IV.

### The Best Interests of the Child

Mr. Marr also takes issue with the trial court's conclusion that terminating his parental rights is in the best interests of the child. He asserts that many of the factors in Tenn.Code Ann. § 36–1–113(i) for determining a child's best interests do not apply to him because he is incarcerated and that the court placed undue weight on his fail-

of these facts. Tenn. R.App. P. 13(d) requires us to defer to the trial court's specific findings of fact as long as they are supported by a preponderance of the evidence. However, we are the ones who must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion. The Tennessee Supreme Court used this approach in *In re Valentine* when it recognized the difference between the conclusion that a biological parent had not complied substantially with her obligations in a permanency plan and the facts relied upon by the trial court to support this conclusion. *In re Valentine*, 79 S.W.3d at 548–49; *see also Jones v. Garrett*, 92 S.W.3d at 838–39.

**15.** Mr. Marr's appellate counsel did not represent him at trial.

**16.** Even if we were to consider Mr. Marr's argument, we would find it unpersuasive. The statute is plain on its face. Tenn.Code Ann. § 36–1–113(g)(6) applies where a parent is confined for a criminal act under a sentence of ten years or more "and the child is under eight (8) years of age at the time the sentence is entered by the court." Thus, what

matters for purposes of this ground is when the sentence is entered, not when the crime for which the sentence was imposed occurred. Moreover, contrary to Mr. Marr's assertion, the other grounds for termination listed in Tenn.Code Ann. § 36–1–113(g) do not all depend on conditions or behavior that can only arise after the conception or birth of the child. *See, e.g.*, Tenn.Code Ann. § 36–1–113(g)(4) (providing for termination of parental rights where "parent ... has been found ... to have committed severe child abuse against the child who is the subject of the petition *or* against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian" without any reference to when the abuse occurred (emphasis added)), (8)(B)(i) (providing for termination of parental rights where "parent ... is incompetent to adequately provide for the further care and supervision of the child because the parent's ... mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent ... will be able to assume or resume the care of and responsibility for the child in the near future" without any reference to when the parent's mental condition arose).

ure to support the child financially. He also asserts that terminating a biological parent's parental rights is never in a child's best interests unless the continuation of the parent-child relationship would harm the child.

## A.

The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests. However, as important as these interests are, they do not dominate every phase of a termination of parental rights proceeding. The best interests of the child do not become the paramount consideration until the trial court has determined that the parent is unfit based on clear and convincing evidence of one or more of the grounds for termination listed in Tenn.Code Ann. § 36–1–113(g). Once a parent has been found to be unfit, the interests of the parent and the child diverge. While the parent's interests do not evaporate upon a finding of unfitness, *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982), the focus of the proceedings shifts to the best interests of the child.

While a finding of parental unfitness is a necessary prerequisite to terminate a parent's rights, a finding of unfitness does not necessarily require that the parent's rights be terminated. *White v. Moody*, 171 S.W.3d at 193; *In re Termination of Parental Rights to Alexander V.*, 271 Wis.2d 1, 678 N.W.2d 856, 863 (2004). Not all parental misconduct is irredeemable. Thus, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's

parental rights is not always in the child's best interests.

The concept of the child's best interests evolved in the context of divorce proceedings and has now migrated from legal discourse into popular culture. What is best for children depends on values and norms upon which reasonable persons can differ. *White v. Moody*, 171 S.W.3d at 193; *Rideout v. Riendeau*, 761 A.2d 291, 296 n. 5 (Me.2000). Thus, critics of the best interests of the child standard often point out that its non-specificity leads to unpredictable and inconsistent outcomes. *Troxel v. Granville*, 530 U.S. at 101, 120 S.Ct. at 2079 (2000) (Kennedy, J., dissenting); PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION 2 & n. 2 (Tentative Draft No. 3 1998); Julie E. Artis, *Judging the Best Interests of the Child: Judges' Accounts of the Tender Years Doctrine*, 38 LAW & SOC'Y REV. 769, 774–75 (2004).

However, others have pointed out that the courts' persistent reliance on the best interests of the child standard suggests that no more appealing formulation is likely to be offered and that it is not much less workable than other standards the law has adopted. 2 HOMER H. CLARK, JR., THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES § 20.4, at 495 (2d ed.1987) [hereinafter THE LAW OF DOMESTIC RELATIONS].[17] Professor Clark, the author of one of the seminal domestic relations treatises, has observed that "few if any experienced judges and lawyers think that ... [the child's best interests standard] goes very far toward deciding cases. That can only be done by considering the facts of the individual case against the background of factors held to be relevant in earlier

---

17. The courts in forty-nine states and the District of Columbia have been charged by statute to use the best interests of the child standard when it comes to custody determi-
nations. Naomi R. Cahn, *Reframing Child Custody Decisionmaking*, 58 OHIO ST. L.J. 1, 9–14 (1997).

cases." 2 THE LAW OF DOMESTIC RELATIONS § 20.6, at 479.

■ In recent years, the Tennessee General Assembly, like other state legislatures, has undertaken to codify the factors that courts should consider when called upon to ascertain a child's best interests in various circumstances. In termination of parental rights cases such as this one, the General Assembly has provided the courts with a non-exclusive list of nine factors to consider. Tenn.Code Ann. § 36–1–113(i).[18] Thus, ascertaining a child's best interests in a termination proceeding is a fact-intensive inquiry[19] requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the legal relationship between the parent and the child is in the child's best interests. *White v. Moody,* 171 S.W.3d at 193–94.

■ The child's best interests must be viewed from the child's, rather than the parent's, perspective. *White v. Moody,* 171 S.W.3d at 194; *In re Hammett,* No. 245221, 2003 WL 22416515, at *2 (Mich.Ct. App. Oct.23, 2003); *People ex rel. L.N., Jr.,* 690 N.W.2d 245, 247 (S.D.2004); *In re Marriage of Pape,* 139 Wash.2d 694, 989 P.2d 1120, 1130 (1999). A focus on the perspective of the child is the common theme running through the list of mandatory factors specified in Tenn.Code Ann. § 36–1–113(i). By the time the court reaches the best interests analysis, it will have already made a finding, supported by clear and convincing evidence, that the parent is unfit or poses a risk of substantial harm to the welfare of the child. Accordingly, the exclusive focus on the perspective of the child in the best interests analysis does not contravene the parent's constitutional rights.

■ Ascertaining a child's best interests does not call for a rote examination of each of Tenn.Code Ann. § 36–1–113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis. *In re Audrey S.,* 2005 WL 2051286, at *27; *White v. Moody,* 171 S.W.3d at 194.

## B.

■ No delicate balancing of the statutory factors is required in this case. As the juvenile court correctly found, all or virtually all of the statutory factors weigh, more or less heavily, in favor of terminating Mr. Marr's parental rights, and none of the statutory factors militates against termination.

Mr. Marr lives in a prison. He has continued to use illegal drugs and has

---

**18.** The Tennessee General Assembly has devised different sets of factors to guide the courts' consideration of the child's best interests in other contexts. *See, e.g.,* Tenn.Code Ann. § 36–6–106(a) (2005) (divorce and other proceedings); Tenn.Code Ann. § 36–6–108(c) (2005) (parental relocation); Tenn.Code Ann. § 36–6–307 (2005) (grandparent visitation); Tenn.Code Ann. § 36–6–404(b) (2005) (parenting plans).

**19.** In another context, we have noted that "[t]he 'best interests' analysis is broad and subjective. It does not employ hard and fast rules and is largely fact-dependent. The Tennessee Supreme Court has candidly noted that the 'best interests' analysis cannot provide perfect solutions to custody and visitation disputes." *Yeager v. Yeager,* No. 01A01–9502–CV–00029, 1995 WL 422470, at *4 (Tenn.Ct.App. July 19, 1995) (No Tenn. R.App. P. 11 application filed) (citations omitted).

amassed a record of fourteen disciplinary violations while incarcerated. He has not seen the child in well over five years, has made no more than token efforts to establish a relationship with the child during this time, and has paid far less to support his child than he could have even given his meager resources.

As a result of his own choices, Mr. Marr has no meaningful relationship with the child. Mr. Marr is currently incarcerated at a facility over two hours away from where the child lives, and instituting visitation at this late date would significantly disrupt the child's life. The fact that Mr. Marr decided to conceive a child at a time when he knew he was facing almost certain conviction for a heinous crime and would therefore most likely be unavailable to support or care for the child for a large portion of the child's early life speaks volumes about his lack of a sustained commitment to this child even before the child was born.

By contrast, Mr. Howlett has demonstrated his commitment to the welfare and long-term well being of this child through years of concrete action. He has changed the child's diapers, assisted Ms. Howlett in feeding, clothing, and providing shelter for the child, been deeply involved in the child's scholastic and extracurricular activities, and, most importantly, loved the child and been present to demonstrate that love. Even Mr. Marr concedes that Mr. Howlett is a wonderful father to the child and that Mr. Howlett and Ms. Howlett have done an excellent job raising him. There can be no question based on the present record that the child's best interests would be served by terminating Mr. Marr's parental rights and that future decisions regarding whether and to what extent Mr. Marr will be involved in the child's life should be made by the two people who have demonstrated by their actions their commitment to supporting and caring for this child—i.e., Ms. Howlett and Mr. Howlett—rather than by Mr. Marr or the courts. Accordingly, the trial court did not err in concluding that it would be in the child's best interests to terminate Mr. Marr's parental rights.

## V.

We affirm the juvenile court's May 6, 2005 judgment terminating Mr. Marr's parental rights. We tax the costs of this appeal to Justin Chandler Marr, for which execution may issue if necessary.

WILLIAM B. CAIN, J., filed a separate concurring opinion.

WILLIAM B. CAIN, J., concurring.

I adhere to my longstanding view that a "preponderance of the evidence" standard and a "clear and convincing evidence" standard are incompatible with each other and cannot be reconciled either in the trial court or in appellate courts. The effort to make these standards compatible, as asserted in *Ray v. Ray*, 83 S.W.3d 726 (Tenn.Ct.App.2001), and its progeny are in my view incorrect for reasons stated at length in *Estate of Acuff v. O'Linger*, 56 S.W.3d 527 (Tenn.Ct.App.2001) and *In re Z.J.S. and M.J.P.*, No. M2002–02235–COA–R3–JV, filed June 3, 2003, 2003 WL 21266854 (Tenn.Ct.App.2003–Cain, concurring).

Since the decision of the trial court is supported by clear and convincing evidence, I concur in the judgment.